IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NORTH BREVARD COUNTY HOSPITAL DISTRICT D/B/A PARRISH MEDICAL CENTER,<br><br>        Plaintiff,<br><br>   v.<br><br>C.R. BARD, INC. and BARD ACCESS SYSTEMS, INC.,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER DENYING CLASS CERTIFICATION**<br><br>Case No. 2:22-cv-00144-RJS-JCB<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Jared C. Bennett |

Plaintiff North Brevard County Hospital District d/b/a Parrish Medical Center (Parrish) filed a Renewed Motion for Class Certification,[1] seeking to represent a class of purchasers of select medical products sold by Defendants C.R. Bard, Inc. and Bard Access Systems, Inc. (Bard). Parrish alleges Bard unlawfully monopolized the market for peripherally inserted central catheters (PICCs) by tying the sale of its tip-location system (TLS) to its sale of PICCs, in violation of §2 of the Sherman Act.[2] Separately, Bard filed a Motion to Exclude the Report and Testimony of Eugenio Miravete, Parrish's expert for class certification.[3]

---

[1] Dkt. 141, *Renewed Motion for Class Certification and Memorandum in Support* [SEALED] (*Motion*); Dkt. 139, Redacted *Motion*.

[2] *Id.* at 1.

[3] Dkt. 157, *Defendants' Motion to Exclude the Report and Testimony of Eugenio Miravete* [SEALED] (*Motion to Exclude*); Dkt 156, Redacted *Motion to Exclude*.

For the reasons stated below, Plaintiff's Motion for Class Certification[4] is DENIED and the court defers judgment on Defendants' Motion to Exclude.[5]

## Background[6]

Bard is a medical device manufacturer producing a range of products, including PICCs, which it sells to hospitals and medical service providers.[7]  PICCs are thin, soft catheters placed in a patient's arm and passed through the body to a vein near the patient's heart.[8]  Once in place, a PICC is used to administer fluids, medications, and nutrients; to sample blood; and to power-inject contrast media.[9]  Serious health risks may arise if a PICC is improperly placed in a patient's body.[10]  Traditionally, clinicians used chest x-rays or fluoroscopy to confirm proper placement of a PICC.[11]  However, these methods have been supplanted by the use of a TLS which allows more precise navigation of the PICC through the body and confirmation of its proper placement.[12]  Use of a TLS offers a less expensive, less-time consuming, more accurate alternative to the traditional methods of PICC placement and has become the standard of care in the industry.[13]

---

[4] *Motion*.

[5] *Motion to Exclude*.

[6] Because this matter is before the court on a motion to certify a class, the court accepts as true all well-pleaded factual allegations contained in the Complaint.  *See Tripp v. Berman & Rabin, P.A.*, 310 F.R.D. 499, 503 (D. Kan. 2015) (accepting "the substantive allegations of the complaint as true" for a motion to certify a class) (internal quotation marks and citations omitted).  For purposes of this background, the court is drawing from factual allegations in Parrish's Complaint and its Renewed Motion for Class Certification.

[7] Dkt. 1, *Complaint* ¶ 1.

[8] *Motion* at 2.

[9] *Id.* at 2–3.

[10] *Id.* at 3.

[11] *Id.*

[12] *Id.*

[13] *Id.*

Bard's TLSs lead the market and have revolutionized PICC placement.[14]  Its flagship TLS, the Sherlock 3CG, facilitates PICC-placement through a combination of ultra-sound, magnetic-tracking, and electrocardiogram technology.[15]  Owing to its innovative technology and the regulatory hurdles complicating entry into the market, Bard commands over 70% share in the TLS market.[16]

A stylet is required to operate a TLS while placing a PICC.[17]  This, Parrish alleges, is where the problem arises.  Only Bard-produced PICCs come with the proprietary stylet necessary to operate Bard's industry-leading TLS.[18]  If a PICC purchaser wishes to use Bard's TLS, the only economically viable option is to purchase a Bard PICC pre-loaded with the necessary stylet.[19]  Because of its commanding position in the TLS market, this combination has allowed Bard to also capture over 70% of the market for the sale of PICCs.[20]  If a purchaser wanted to use a Bard TLS but preferred a competitor's PICC, it would have to purchase two PICCs—the Bard PICC with the required stylet and the desired competitor's—when only one is needed.[21]

Bard's alleged tying of its PICCs and TLSs forms the crux of Parrish's Sherman Act § 2 claim.[22]  Bard sells the majority of TLSs on the market and PICCs used with a TLS constitute the

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 4.

[20] *Id.*

[21] *Id.*

[22] *Id.* at 1.

largest segment of the PICC market.[23]  By tying the sale of its TLSs to the sale of its PICCs,

Parrish alleges, Bard has unlawfully monopolized the entire PICC market, resulting in proposed

class members paying PICC prices that are 9.7% to 34.5% above what Parish estimates to be

competitive pricing.[24]  Bard can charge these supracompetitive prices because, under Parrish's

theory, the alleged tie has suppressed competition in the PICC market, preventing Bard's

competitors from accumulating sufficient market share to bid Bard's monopoly pricing down to

competitive levels.[25]  According to Parrish, Bard's anticompetitive conduct adversely impacts all

PICC purchasers, whether they purchase PICCs with a TLS or—like Parrish—purchase only

standalone PICCs.[26]  And, this impact is felt by all notwithstanding the fact that purchase price is

not standardized, but a function of negotiations between Bard and the purchasers.[27]

### Procedural History

Parrish filed this lawsuit on March 31, 2020, in the United States District Court for the

Northern District of New York.[28]  Suing under §§ 4 and 16 of the Clayton Act,[29] Parrish brought

two claims against Bard: 1) Bard's tying of its TLSs with its PICCs violated § 1 of the Sherman

Act,[30] and 2) Bard's monopolization of the PICC market violated § 2 of the Sherman Act.[31]

---

[23] *Id.* at 5.

[24] *Id.* at 5.

[25] *Id.*

[26] *Id.*

[27] *See* Dkt. 168, *Reply Memorandum in Support of Renewed Motion for Class Certification* (*Reply*) at 6.

[28] Dkt. 1, *Complaint*.

[29] *Id.* at ¶ 11.

[30] *Id.* at ¶¶ 85–100.

[31] *Id.* at ¶¶ 101–05.

Parrish sought to bring its claims on behalf of a class of direct purchasers—including hospitals, hospital systems, and clinics—of PICCs sold by Bard on or after March 31, 2014.[32]

On June 5, 2020, Bard filed a Motion to Transfer Venue requesting the New York court transfer the action to the District of Utah, where its PICC business is headquartered.[33]  On March 24, 2021, the District Court for the Northern District of New York denied the Motion with leave to renew to address whether the District of Utah could exercise personal jurisdiction over C.R. Bard.[34]  Bard addressed this question in its Renewed Motion to Transfer Venue filed on April 19, 2021.[35]  While the Motion to Transfer was pending, Bard filed a Motion for Judgment on the Pleadings[36] and Parrish filed a Motion for Class Certification.[37]  On February 15, 2022, the Northern District of New York granted Bard's transfer request and transferred the case to the District of Utah, reserving the outstanding motions for this court to decide.[38]

On November 22, 2022, after hearing oral argument, this court granted in part and denied in part Bard's Motion for Judgment on the Pleadings.[39]  The court granted Bard's Motion concerning Parrish's claim for violation of § 1 of the Sherman Act, finding Parrish lacked antitrust standing to assert it.[40]  Concerning Parrish's second claim—unlawful monopoly

---

[32] *Id.* at ¶ 80.

[33] Dkt. 25-1, *Memorandum of Law in Support of C.R. Bard, Inc's and Bard Access Systems, Inc.'s Motion to Transfer Venue* at 1–2.

[34] Dkt. 28, *Decision and Order*.

[35] Dkt. 34, *Renewed Motion to Transfer Venue*.

[36] Dkt. 47, *Motion for Judgment on the Pleadings*.

[37] Dkt. 85, *Motion to Certify Class*.

[38] Dkt. 92.

[39] Dkt. 136, *Minute Order*.

[40] *Id.*

maintenance in violation of § 2 of the Sherman Act—the court found Parrish had adequately pled standing and denied Bard's Motion, permitting the § 2 claim to proceed.[41]

On December 12, 2022, Parrish filed its Renewed Motion for Class Certification, seeking certification for the remaining § 2 claim.[42]  Parrish requests certification of a damages class, under Rule 23(b)(3) of the Federal Rules of Civil Procedure, and a Rule 23(b)(2) injunctive class.[43]  Parrish's Motion relies on the Initial Class Expert Report of economist Dr. Eugenio Miravete.  The Report details Bard's allegedly anticompetitive conduct and purportedly demonstrates a methodology for establishing antitrust price injury and damages inflicted on all, or nearly all, members of the proposed class.[44]

On February 24, 2023, Bard filed a Motion to Exclude the Report and Testimony of Eugenio Miravete.[45]  Bard argues Dr. Miravete's injury and damages opinions are not supported by any reliable methodology and should be excluded.[46]

The court heard argument on the Motions on November 14, 2023.[47]  The Motions are now fully briefed and ripe for review.  Because, even accepting the report and testimony of Dr. Miravete, Parrish's Motion for Class Certification fails, the court addresses only the Motion for Class Certification below and defers judgment on Bard's Motion to Exclude for a later date.

---

[41] *Id.*

[42] *Motion.*

[43] *Id.* at 1.

[44] *Id.* at 2; Dkt. 141-1, *Initial Class Expert Report of Dr. Eugenio Miravete in Support of Plaintiff's Renewed Motion for Class Certification.*

[45] *Motion to Exclude.*

[46] *Id.* at 1.

[47] Dkt. 187.

## I.    Renewed Motion for Class Certification

Parrish seeks certification of a Rule 23(b)(3) damages class and a Rule 23(b)(2) injunctive class based on Bard's alleged monopolization of the PICC market.[48]  Parrish defines the class as:

> U.S. direct purchasers from Bard of its peripherally inserted central catheters ("PICCs") on or after March 31, 2016.  Purchasers include in part hospitals, hospital systems, and clinics.[49]

Parrish estimates this class could consist of over 7,200 purchasers of Bard PICCs during the class period.[50]

## Legal Standard

Rule 23 of the Federal Rules of Civil Procedure establishes the standards for class certification.[51]  The party seeking certification must first demonstrate the proposed class satisfies all requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and then show compliance with one or more of the class types set forth in Rule 23(b).[52]  Parrish seeks certification of a damages class pursuant to Rule 23(b)(3) and an injunctive class pursuant to Rule 23(b)(2).  Certification under Rule 23(b)(3) requires a party demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[53]  Rule 23(b)(2) requires "the

---

[48] *Motion* at 1.

[49] *Id.*

[50] *Id.* at 7.

[51] *See* Fed. R. Civ. P. 23; *see also Shook v. El Paso Cty.*, 386 F.3d 963, 971 (10th Cir. 2004) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (citation omitted).

[52] *See* Fed. R. Civ. P. 23(a)–(b).

[53] Fed. R. Civ. P. 23(b)(3).

party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[54]

The Tenth Circuit recently emphasized "[i]t is essential that courts keep in mind that 'Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule.'"[55] "[T]he party seeking class certification must prove the requirements 'are *in fact*' satisfied."[56] As the party seeking certification here, Parrish carries the burden of "affirmatively demonstrat[ing] [its] compliance with Rule 23."[57]

In evaluating whether a party has met its burden, the court conducts "a rigorous analysis, often necessarily 'prob[ing] behind the pleadings."[58] The analysis typically requires some consideration of the merits, but this inquiry is limited to the extent it is "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[59] At this stage, the court "must generally accept the substantive, non-conclusory allegations of the complaint as true."[60]

---

[54] Fed. R. Civ. P. 23(b)(2).

[55] *Brayman v. KeyPoint Gov. Sols., Inc.*, 83 F.4th 823, 837 (10th Cir. 2023) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

[56] *Black v. Occidental Petroleum Corp.*, 69 F. 4th 1161, 1174 (10th Cir. 2023) (quoting *Dukes*, 564 U.S. at 350) (emphasis in original).

[57] *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Dukes*, 564 U.S. at 350).

[58] *Occidental Petroleum*, 69 F. 4th at 1174 (quoting *Comcast*, 569 U.S. at 33).

[59] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

[60] *Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009).

This does not mean, however, the court may "relax or shift the burden of proof to liberally construe Rule 23's requirements or resolve doubts in favor of certification."[61]

## Analysis

The court first addresses the threshold requirements of Rule 23(a) before turning to the Rule 23(b) analysis. For the reasons explained below, the court concludes Parrish has not met its burden and denies certification of the proposed classes.

### 1. Rule 23(a)

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."[62]  This exception is justified only in circumstances where the class representative is "part of the class and 'posses[es] the same interest and suffer[s] the same injury' as the class members."[63]  The four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—guarantee that "named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."[64]

Bard disputes only the typicality and adequacy prongs of the Rule 23(a) requirements.[65] However, in the interest of thoroughness, the court evaluates all four requirements.[66]

---

[61] *Occidental Petroleum*, 69 F. 4th at 1174; *see Wallace B. Roderick Revocable Living Tr. V. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013) ("Relaxing and shifting Rule 23(a)'s strict burden of proof results in an abuse of discretion").  Parrish argues in its Motion and Reply that any doubts or uncertainty should be resolved in favor of class certification.  *See* Dkt. 141 at 6; Dkt. 168 at 21.  This proposition is wrong as a matter of law in the Tenth Circuit.

[62] *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).

[63] *Dukes*, 564 U.S. at 348–49 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 216 (1974))).

[64] *Id.*

[65] Dkt. 159, *Defendants' Memorandum of Law in Opposition to Plaintiff's Renewed Motion for Class Certification* [SEALED] (*Opposition*) at 37–40.

[66] *See Shook*, 386 F.3d at 972 (finding "[t]he district court erred by not specifically addressing the traditional Rule 23 factors").

### a.   Numerosity

The numerosity prong of Rule 23(a)(1) requires the plaintiff show "the class is so numerous that joinder of all members is impracticable."[67]  "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."[68]  Plaintiffs must demonstrate "'some evidence of established, ascertainable numbers constituting the class,' but there is 'no set formula to determine if the class is so numerous that it should be certified.'"[69] In addition to the numbers, there are several "factors that enter into the impracticability issue."[70] These may "includ[e] the nature of the action, the size of the individual claims, and the location of the members of the class."[71]  "Because it is such a fact-specific inquiry," the court has "wide latitude" to determine the standard has been met.[72]

The court concludes the numerosity requirement here is met.  To meet its burden, Parrish relies on monthly sales data produced by Bard.[73]  The data shows over 7,200 discrete customers located throughout the United States for the period of January 2011 through March 2020.[74] Though the proposed class is comprised only of those who purchased PICCs from Bard on or after March 31, 2016, this group likely still includes thousands of members dispersed throughout

---

[67] Fed. R. Civ. P. 23(a)(1).

[68] *Gen. Tel. Co. of the Nw., Inc. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 330 (1980).

[69] *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (quoting *Rex v. Owens ex rel. Okla.*, 585 F.2d 432, 436 (10th Cir. 1978)).

[70] *Horn v. Assoc'd Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir. 1977).

[71] *Colo. Cross Disability Coal.*, 765 F.3d at 1215 (quoting 7A Charles Alan Wright, Arthur R. Miller & Marry Kay Kane, Federal Practice and Procedure § 1762, at 206–07 (3d ed. 2005)).

[72] *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

[73] *Motion* at 7; Dkt. 141-1 at 24.

[74] *Motion* at 7.

the United States.  The court is satisfied that "joinder of all members is impracticable" given the number and location of proposed class members.[75]

### b.  Commonality

To meet the commonality requirement of Rule 23(a)(2), a plaintiff must demonstrate that "there are question of law or fact common to the class."[76]  Bard focuses the bulk of its Opposition on the similar, though more rigorous, predominance requirement of Rule 23(b)(3) but does not directly contest Parrish's satisfaction of commonality under Rule 23(a)(2).  Because "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions," this element is addressed in the predominance section below.[77]

### c.  Typicality

Rule 23(a)(3) requires Parrish show its claims "are typical of the claims" of the class they seek to represent.[78]  Akin to commonality, "typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."[79]  The claims of Parrish and other proposed class members "need not be identical to satisfy typicality."[80]  So long as Parrish's claim is "based on the same legal or remedial theory" as other class members, "differing fact situations of the class members do not defeat typicality."[81]  That said, "it is well-established that a proposed class representative is not

---

[75] Fed. R. Civ. P. 23(a)(1); *see Lawrence v. First Fin. Inv. Fund V, LLC*, 336 F.R.D. 366, 374 (D. Utah 2020) (finding proposed class of approximately 800 members met numerosity requirement).

[76] Fed. R. Civ. P. 23(a)(2).

[77] *Brayman*, 83 F.4th at 838 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 609 (1997)).

[78] Fed. R. Civ. P. 23(a)(3).

[79] *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1199 (10th Cir. 2010).

[80] *Id.* at 1198.

[81] *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).

'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become a major focus of the litigation.'"[82]

Parrish contends its claim is typical of the proposed class because, as a direct purchaser of Bard PICCs, it suffered the same antitrust price injury from Bard's alleged monopolization of the PICC market as all other purchasers of Bard PICCs.[83]  This is true despite factual differences amongst individual purchasers because, as Parrish alleges, Bard tied sales of its PICCs to its TLSs to monopolize the PICC market, forcing "Parrish and all members of the proposed Class to pay above-competitive prices for PICCs whatever location method they used."[84]  Bard counters that Parrish's "overbroad class definition makes it impossible for it to satisfy" the typicality standard.[85]  Bard asserts Parrish fails typicality because (1) its claims would be subject to unique defenses, and (2) most putative class members would have to show a different injury than Parrish.[86]  The court agrees with Bard.

First, Parrish's claims would be subject to unique defenses because it has arguably not suffered any antitrust injury due to its non-price-based preferences for Bard PICCs.  Parrish is distinct from the majority of the proposed class—it does not use a TLS and purchases only Bard's standalone PICCs.[87]  Parrish—unlike class members preferring a TLS—could purchase PICCs from Bard competitors but chooses not to.[88]  Parrish representatives testified Parrish

---

[82] *Thornton v. Kroger Co.*, No. CIV 20-1040 JB/LF, 2023 WL 6378417, at *24 (D.N.M. Sept. 29, 2023) (quoting *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 687 (D. Colo. 2014) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012))); *see also Wesley v. Snap Fin. LLC*, 339 F.R.D. 277, 293 (D. Utah 2021) ("A unique defense may destroy typicality if that defense is 'likely to become a major focus of the litigation.'").

[83] *Motion* at 9.

[84] *Id.*

[85] *Opposition* at 3.

[86] *Id.* at 37–39.

[87] *Id.* at 24–26.

[88] *Id.* at 25.

prefers Bard PICCs because Bard offers features and services that competitors do not, and Parrish would continue to purchase PICCs from Bard regardless of whether Bard unbundled its PICCs and TLSs.[89]  Moreover, as Parrish clarifies in its Reply, only 10% of Parrish's PICC purchases from Bard are of a PICC for which there are not competitive alternatives.[90]  Ninety percent of Parrish's PICC purchases from Bard are of a model "where there are competitive PICCs."[91]  Parrish chooses these PICCs over comparable competitor PICCs because, price notwithstanding, it prefers Bard PICCs.

This acknowledgment likely dooms Parrish's attempt to establish typicality.  Given Parrish's testimony that it has non-price preferences for Bard PICCs, Parrish's claim is susceptible to the unique defense that it has suffered no antitrust injury.  Parrish acknowledges it buys Bard PICCs for reasons other than price and even chooses these PICCs over available competitor PICCs.  Other courts have rejected the antitrust claims of plaintiffs in similar circumstances.[92]  This conclusion does not require the court to improperly consider the merits of Parrish's claim.  It is simply a recognition that Parrish, by its own admission, is qualitatively different from many other putative class members.  Even assuming some have been injured by

---

[89] *Id.* at 25–26; Dkt. 159-4, Ex. 7 *Parrish 30(b)(6) Dep.* at 174–207.

[90] *Reply* at 22.

[91] *Id.* at 22–23.

[92] *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) (noting proof of injury is a required element in an antitrust action and plaintiffs "who would have continued to purchase a brand drug for various reasons, even if a cheaper, generic version had been available," are unable to show antitrust injury); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 171–72 (C.D. Cal. 2007) (denying class certification in antitrust action involving the sale of differentiated medical products where there was considerable evidence of "brand-loyalty and price-insensitivity" because "a majority of Plaintiffs' own class representatives have admitted either to unencumbered discretion in their purchasing decisions, a preference for lawful Tyco incentives over the competing alternatives, or satisfaction with Tyco's products as priced sufficient to preempt, not only all demand for, but also any curiosity about, rival options.").

Bard's allegedly anticompetitive conduct, Parrish arguably has not.[93]  Resolution of that

individual argument—a defense unique to Parrish—would likely become a "major focus of the

litigation."[94]

Second, Parrish is not typical because most proposed class members would have to show

a different injury than Parrish.  Parrish is distinct from most proposed class members.  It only

purchases Bard's standalone PICCs.  Most class members purchase a PICC—the alleged tied

product—in a bundle with the TLS—the alleged tying product.[95]  But a standalone PICC and a

PICC preloaded with a stylet to operate a TLS are different products.[96]  At trial, Parrish would

have to prove it suffered an unlawful overcharge on the standalone PICC.  Even assuming

Parrish makes that showing, it would not prove purchasers of the bundle were similarly

overcharged.  Further, even proof one purchaser of the bundle was overcharged would not prove

injury for all purchasers of a bundled product due to the wide "variability in circumstances and

interests" of each purchaser.[97]  Each of these class members would have to make a separate

showing of injury.  Consistent with other courts who have found a lack of typicality, "there is

sufficient heterogeneity to indicate that proof that one Plaintiff was overcharged is not probative

of whether other class members were overcharged."[98]

---

[93] To be clear, the court's conclusion here does not turn on the potential presence of uninjured class members. Rather, its typicality determination rests on the fact that Parrish's atypical situation raises a compelling question as to whether it has suffered any antitrust injury at all.  For these purposes, the court could assume all other putative class members are injured.  The issue is Parrish, by its own admission, arguably is not and that will likely become a major focus of the litigation.

[94] *Wesley*, 339 F.R.D. at 293.

[95] *Opposition* at 39.

[96] *Id.* at 7.

[97] *Tyco.*, 247 F.R.D. at 179.

[98] *Id.* (finding plaintiffs failed to meet the typicality requirement due to the broad differences between class members where each "had significantly different purchasing volumes, preferred different sensor products, and operated under materially different contract terms.").

Because Parrish's claims are susceptible to unique defenses and most class members would have to prove a different injury, Parrish has failed to demonstrate its claims "are typical of the claims or defenses of the class."[99]

### d. Adequacy of Representation

The final element of Rule 23(a) requires the party seeking class certification to show they "will fairly and adequately protect the interests of the class."[100]  Adequacy "factors in competency and conflicts of class counsel."[101]  To establish adequacy, the Tenth Circuit asks (1) whether the class representative and its counsel have any "conflicts of interest with other class members," and (2) will the class representative and its counsel "prosecute the action vigorously on behalf of the class."[102]  Minor conflicts between class members do not preclude certification—"[o]nly a 'fundamental conflict' about the specific issues in controversy will prevent a named plaintiff from representing the interests of the class adequately."[103] Fundamental conflicts arise "where some class members claim an injury resulting from conduct that benefitted other class members."[104]  At bottom, as courts in sister circuits applying the same standard have distilled this inquiry, a proposed class "consist[ing] of winners and losers" cannot be certified.[105]

---

[99] Fed. R. Civ. P. 23(a)(3).

[100] Fed. R. Civ. P. 23(a)(4).

[101] *Amchem Prod.*, 521 U.S. at 626 n.20.

[102] *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002).

[103] *In re EpiPen Mktg., Sales Prac. & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2020 WL 1180550, at *19 (D. Kan. Mar. 10, 2020) (internal quotation omitted).

[104] *Id.*

[105] *In re Photocromic Lens Antitrust Litig.*, MDL Docket No., 2173, 2014 WL 1338605, at *10 (M.D. Fla. Apr. 2, 2014) (citing *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("Thus, a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class.")).

Parrish argues it is an adequate representative because it has no conflicts with the proposed class and has protected the interests of the class throughout this litigation.[106]  Under Parrish's theory, all members of the class have been harmed by Bard's alleged monopoly pricing and none benefit from it.[107]  Parrish and all class members seek the same overcharge remedy for the alleged antitrust price injury they have suffered.[108]  Further, Parrish argues its counsel— whom it has cooperated with in this litigation for over two years—are experienced in representing nationwide antitrust damage classes, as well as in prosecuting antitrust and other complex litigation.[109]

Bard argues Parrish fails to establish adequacy because it, along with some other class members, actually benefit from the alleged tie.[110]  Bard contends that in a world absent the alleged tie, customers like Parrish, who purchase Bard's standalone PICCs, and those who would continue to purchase a Bard TLS-PICC bundle, would likely pay more for its PICCs.[111]  This is so because, applying Parrish's theory, without the alleged tie, demand for Bard's competitors' PICCs would increase as some customers would choose to combine Bard's TLS with another company's PICC.[112]  Rather than increased competition in the PICC market driving PICC prices down, Bard's expert, Dr. Noether, asserts "economic theory" predicts Bard's competitors would be incentivized to raise their prices for standalone PICCs and Bard would be incentivized to

---

[106] *Motion* at 10.

[107] *Id.*

[108] *Id.*

[109] *Id.* at 10–11.

[110] *Opposition* at 37.

[111] *Id.*

[112] *Id.* at 38.

follow.[113]  Additionally, for those who continue to purchase a Bard TLS-PICC bundle, Bard would know these customers have non-price-based preferences and would likely raise prices.[114] Both of these groups of class members—Parrish among them—benefit from the alleged tie, while those who, in a world without the alleged tie, would choose to combine a Bard TLS with a competitor's PICC are worse off.[115]  Due to these "conflicts between winners and losers," Bard argues, Parrish is not an adequate representative of the class.[116]

Though the court's decision to deny class certification does not depend on this element, the court agrees Parrish has difficulty establishing adequacy because the proposed class is beset with winners and losers.  Much of the parties' argument concerning adequacy involves dueling expert opinions the court need not resolve at this juncture.  However, considering the broad, highly differentiated class Parrish has proposed, it is likely a fundamental conflict exists, resulting in some class members claiming "an injury resulting from conduct that benefited other class members."[117]  This issue seems particularly acute for class members who would continue to buy the bundled products in a world without the alleged tie.  As Dr. Noether highlights, basic economic principles indicate Bard would readily identify these purchasers as having non-price-based preferences for Bard's bundled products and be able to charge them a premium.[118]  At the very least, these class members benefit from the conduct allegedly injuring others.

---

[113] *Id.*

[114] *Id.*

[115] *Id.* at 37.

[116] *Id.*

[117] *In re EpiPen*, 2020 WL 1180550, at *19.

[118] *Opposition* at 37.

Accordingly, representation is not adequate because the proposed class consists of numerous members—perhaps even Parrish among them—who are likely better off today than they would be in a world without the alleged tie.

## 2. Rule 23(b)(3)

Though the court concludes Parrish has failed to meet its burden under the threshold requirements of Rule 23(a), in the interest of completeness the court will consider whether the Rule23(b) standards have been met.  Under Rule 23(b)(3), Parrish must demonstrate "(1) that questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods of fairly and efficiently adjudicating the controversy."[119]  These standards are met "as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation."[120]

### a. Predominance

Though the predominance inquiry echoes the Rule 23(a) commonality inquiry, "the predominance criterion is far more demanding[.]"[121]  The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."[122]  The court categorizes issues as common or individual, then "weigh[s] which issues predominate."[123]  "This is done by 'considering how the class intends to answer factual and legal questions to prove its claim—and

---

[119] Fed. R. Civ. P. 23(b)(3).

[120] *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014).

[121] *Amchem Prod.*, 521 U.S. at 624.

[122] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 William B. Rubenstein et al., *Newberg on Class Actions* § 4:49 (5th ed. 2012)).

[123] *CGC Holding Co.*, 773 F.3d at 1087.

the extent to which the evidence needed to do so is common or individual.'"[124]  The presence of individual issues, even on questions such as damages, does not defeat predominance if "one or more of the central issues in the action are common to the class and can be said to predominate."[125]  As a sister circuit illustratively explains, the objective of the predominance inquiry is to test "whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair,'" describing inefficiency "as a line of thousands of class members waiting their turn to offer testimony and evidence on individual issues."[126]

Consideration of whether common issues predominate begins "with the elements of the underlying cause of action."[127]  Parrish alleges Bard monopolized the PICC market in violation of § 2 of the Sherman Act.[128]  "Section 2 of the Sherman Act prohibits any 'monopoliz[ation], or attempt to monopolize, or combin[ation] or conspir[acy] with any other person or persons, to monopolize any part of the trade or commerce among the several states.'"[129]  To show a violation, Parrish must prove "(1) the possession [by Bard] of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[130]

In the Tenth Circuit, Parrish must establish the relevant market and prove Bard's "(1) 'dangerous probability of success in monopolizing' that market, (2) 'specific intent to

---

[124] *Wesley*, 339 F.R.D. at 298 (quoting *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 915 (10th Cir. 2018)).

[125] *Tyson Foods*, 577 U.S. at 453 (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–24 (3d 2005)).

[126] *In re Asacol*, 907 F.3d at 51.

[127] *CGC Holding Co., LLC*, 773 F.3d at 1088.

[128] *Complaint* at 21–22.

[129] *Occidental Petroleum Corp.*, 69 F.4th at 1175 (quoting 15 U.S.C. § 2).

[130] *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

monopolize[,]" and (3) 'conduct in furtherance' of its attempted monopolization."[131]
Additionally, to obtain a private civil remedy and treble damages under the Clayton Act, Parrish
must also "prove [it] suffered antitrust impact, that is, 'injury of the type the antitrust laws were
intended to prevent and that flows from that which makes defendant[s'] acts unlawful[,]' and the
amount of damages sustained."[132]  In other words, to establish its antitrust claim, Parrish must
prove "(1) a violation of antitrust law, (2) antitrust injury/impact caused by the violation, and (3)
damages sustained by the plaintiff."[133]  The court now addresses each of these elements to
determine if Parrish has established common issues and proof will predominate.

### i.  Antitrust Violation

The court concludes Parrish has demonstrated it is capable of presenting common
evidence to prove Bard monopolized the PICC market in violation of § 2 of the Sherman Act.
Parrish is prepared to demonstrate, through common proof, evidence of Bard's alleged monopoly
power in the relevant market and its willful acquisition or maintenance of that power.[134]  As
Parrish asserts, because Bard's allegedly anticompetitive scheme impacted the PICC market as a
whole,"[t]he same evidence would be introduced to prove elements of the monopolization
violation" whether the claims proceed as a class or individually.[135]  Bard focuses its argument on
the antitrust impact and damages elements of the claim and does not contest Parrish's ability to
demonstrate a violation through common proof.

---

[131] *Occidental Petroleum Corp.*, 69 F.4th at 1175 (quoting *Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am.*, 885 F.2d 683, 693 (10th Cir. 1989)).

[132] *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

[133] *Deselms v. Occidental Petroleum Corp.*, No. 19-CV-0243-F, 2022 WL 20055630, at *7 (D. Wyo. Apr. 26, 2022) (citing *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, at 302 (5th Cir. 2003)), *aff'd sub nom. Black v. Occidental Petroleum Corp.*, 69 F.4th 1161 (10th Cir. 2023).

[134] *Motion* at 12.

[135] *Id.*

To prove Bard's alleged antitrust violation, Parrish establishes two relevant markets and shows Bard's market power in both through common proof.  Relying on the report of its expert, Dr. Miravete, Parrish defines the relevant product markets as the TLS market and the PICC market.[136]  Dr. Miravete shows Bard has over 70% market share in both relevant markets.[137]  Further, "at least 90% of all PICCs placed with guidance used Bard's TLSs."[138]  While Parrish only alleges Bard has unlawfully monopolized the PICC market, the TLS market is relevant because it is Bard's command over this market which enables its monopoly over the PICC market through the tying of its TLSs and PICCs.[139]

Under Parrish's theory, this alleged tie is anticompetitive conduct in violation of the Sherman Act.[140]  In order to operate a Bard TLS, a purchaser requires a proprietary stylet only obtainable through the purchase of a Bard PICC.[141]  Bard has thus acquired and maintained a monopoly over the PICC market by effectively forcing purchasers of its TLS to buy its PICCs, even though, according to Parrish, many would prefer a competitors' PICC.[142]  Because of Bard's commanding share of the TLS market, ripples are felt throughout the broader PICC market, allowing Bard to exclude competitors and charge supracompetitive prices for its PICCs.[143]

---

[136] *Motion* at 2.

[137] *Id.* at 3.

[138] Dkt. 141-1, *Initial Class Expert Report of Dr. Eugenio Miravete* at 12.

[139] *Id.* at 16 ("The available evidence indicates Bard's tying policy acts as an artificial barrier to entry, foreclosing competitors and protecting its dominant share in the U.S. PICC market.").

[140] *Motion* at 4.

[141] *Id.*

[142] *Id.*

[143] *Id.*

Parrish further alleges Bard's anticompetitive conduct is intentional.  Bard has FDA approval to sell its products separately.[144]  In fact, in the case of one purchaser, the Cleveland Clinic, it has done so.[145]  According to Parrish, Bard's decision not to do the same for others is "a choice[,]" "part of its knowing and deliberate strategy to expand its PICC market share."[146]

The court finds the evidence Parrish presents concerning the relevant markets, Bard's market power in both, its alleged monopolizing conduct, and intent would be common to all class members.  "Evidence pertaining to barriers to entry, the number of competitors, or market trends" relate to the market as a whole.[147]  Further, Bard could "put forth common, class-wide evidence to disprove its alleged monopoly power" in the relevant markets.[148]  Thus, common issues would predominate on this element of Parrish's claim.

### ii.  Antitrust Impact and Damages

However, the court determines Parrish's effort to establish predominance falls short because it has not shown it is capable of demonstrating antitrust impact and damages through a common methodology.[149]  As a private plaintiff, Parrish must prove antitrust impact to succeed on its claim and recover damages under the Clayton Act.[150]  "Antitrust impact is 'injury [that] reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made

---

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] *Occidental Petroleum Corp.*, 69 F.4th at 1179.

[148] *Id.*

[149] The court recognizes a failure to demonstrate damages alone through common proof does not necessarily defeat predominance.  *See In re Urethane Antitrust Litigation*, 768 F.3d 1245, 1255 (10th Cir. 2014) (citation omitted). However, individual issues clearly predominate when a plaintiff, like Parrish here, is unable to show both impact and damages through common proof.  Given that, and because the analysis for both elements is largely the same, the court addresses both together.

[150] *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

possible by the violation.'"[151]  At the class certification stage, the question is not whether the plaintiff has presented evidence sufficient to win on the merits, but rather whether it has demonstrated a methodology or analysis "that applies to the claims for all class members and the issue does not affect class members differently."[152]  Parrish has failed to do this for at least two overarching reasons: (1) Parrish's regression model and average overcharge benchmarks are not capable of showing whether any individual class member was injured, let alone all of them, and (2) Parrish's methodology is not capable of disaggregating between lawful and unlawful overcharges and thus fails to meet the requirements of *Comcast*.

### A.  Parrish's Model

Parrish argues it has presented a two-step methodology capable of demonstrating impact and damages through common proof.  At the first step, Parrish presents a regression model it asserts demonstrates PICC pricing is primarily determined by factors common to all purchasers.[153]  Then, Parrish offers a variety of benchmarks purporting to establish the average overcharge each class member paid for PICCs due to the alleged antitrust injury.  The overcharge ranges from 9.7% to 34.5% above estimated competitive pricing, depending on the benchmark selected.[154]  Bard counters that Parrish's model does not demonstrate impact and damages through common proof because its "common factors" regression "does not show that *any* Bard customer in fact paid an overcharge, let alone that all customers suffered the same

---

[151] *Deselms*, 2022 WL 20055630, at *9 (quoting *Brunswick Corp.*, 429 U.S. at 489).

[152] *In re EpiPen*, 2020 WL 1180550, at *51.  *See also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666–67 (9th Cir. 2022) (holding at class certification the question is "whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial.") (en banc) (emphasis in original).

[153] *Motion* at 16.

[154] *Id.* at 5.

overcharge."[155]  Further, Bard argues, Parrish's use of a class-wide average is "especially inappropriate in a monopolization case based on a differentiated product market with heterogeneous customers and individualized pricing."[156]  The court agrees with Bard.

Parrish acknowledges the PICC market is heterogeneous with many different types of customers purchasing many different types of products.  However, it purports to demonstrate common antitrust injury, notwithstanding that differentiation, through a statistical regression and benchmarking technique.[157]  Parrish's expert, Dr. Miravete, constructed a regression model "to test whether Bard's PICC prices can be determined by common, observable factors or instead by factors individual to each class member."[158]  After accounting for a variety of factors—including product specific characteristics, distribution channel, and customer type[159]—Parrish contends its model shows that "86% of the price variation in PICC pricing can be explained using common attributes and only 5% of the price variation is due to Class member-specific factors."[160]  If common factors largely explain PICC pricing, Parrish's argument goes, then the model is capable of showing antitrust impact and damages through common proof by applying an average overcharge to each class-member, as determined by Parrish's benchmarks.

At this second step, Parrish's expert estimates the overcharge—the antitrust price injury—using one of four "viable" benchmarks.[161]  The benchmarks demonstrate injury by comparing Bard's monopoly PICC margins with competitive margins, as established by

---

[155] *Opposition* at 30.

[156] *Id.* at 29.

[157] *Motion* at 16.

[158] *Id.* (internal quotation omitted).

[159] *Reply* at 8.

[160] *Motion* at 16.

[161] *Id.*

purportedly comparable product markets.[162]  Parrish contends these benchmarks allow it to

"estimate 'but for' competitive pricing" through common proof.[163]  Under Parrish's theory, a

simple application of the common average overcharge to each class members' total purchases—

pricing for which, as the regression demonstrates, is determined by common factors—determines

the amount of injury and damages.

The court begins with the inability of the regression model to show antitrust impact

through common proof.  As Bard demonstrates, Parrish's regression model tells the court nothing

about whether any individual class members were injured.[164]  Parrish assures the court regression

models are commonly accepted "as a generally reliable econometric technique to control for the

effects of the differences among class members and isolate the impact of the alleged antitrust

violations on the prices paid by class members."[165]  The court does not dispute this, but that is

not what Parrish's model does.

Parrish's regression model is the statistical equivalent of a tautological statement.  Parrish

essentially says, after accounting for all of the highly individualized factors relevant to pricing of

PICCs in the highly differentiated PICC market, we have determined these factors establish the

price of a PICC.  Therefore, Parrish says, PICC pricing is determined by common factors.  But

this entirely glosses over the point.  Each of those individualized factors relevant to the price of a

PICC is the individualized inquiry that would be required for every class member.  This would

be required not only to determine the amount of injury, but whether there was any injury at all.

In fact, Parrish's argument proves Bard's point that this is not a class for which common proof is

---

[162] *Id.*

[163] *Id.* at 18.

[164] *Opposition* at 26.

[165] *Reply* at 7.

25

available.  Simply having a regression model does not end the inquiry.  That model must actually

serve a purpose.  Parrish's regression model does nothing more than demonstrate "a line of

[7,200] class members waiting their turn to offer testimony and evidence on individual

issues."[166]

Next, Parrish's benchmark analysis is incapable of demonstrating injury through common

proof because this case is ill-suited to the use of class-wide averages.  Parrish again seeks to

reassure the court that benchmarking is a technique "widely used by economists and the courts to

estimate class-wide antitrust price injury."[167]  Again, the court does not dispute that, but Parrish

fails to acknowledge it is a technique widely used in only a certain type of antitrust case.  Parrish

urges the court to make an inference of common impact, allowing it to apply a uniform

overcharge, that is inappropriate in this case.

The distinction Parrish fails to reckon with is that its average overcharge methodology is

generally only acceptable in the price-fixing context.  "Under the prevailing view, price-fixing

affects all market participants, creating an inference of class-wide impact even when prices are

individually negotiated."[168]  The Tenth Circuit recently emphasized a presumption of impact—

such as the application of a uniform average overcharge—should not be applied broadly to all

allegedly anticompetitive conduct.[169]  As other courts have explained, "an illegal price fixing

agreement that directly inflates prices is far more persuasive to show that injury can be proven on

a class-wide basis, than an alleged array of anti-competitive conduct having an *indirect effect* on,

---

[166] *In re Asacol*, 907 F.3d at 51.

[167] *Motion* at 16.

[168] *In re Urethane*, 768 F.3d at 1255.

[169] *Occidental Petroleum*, 69 F.4th at 1182 ("*In re Urethane* is limited to its facts, in particular plaintiffs' evidence of the polyurethane industry's standardized pricing structure, the defendant's price-fixing conspiracy, and the artificially inflated baseline for pricing negotiations.  This evidence supported a reasonable conclusion that 'price-fixing would have affected the entire market.'").

among other things, the general price level."[170]  Indeed, for class certification outside of the price-fixing context, "proof of fact of injury requires much more than a simple showing that the plaintiffs purchased an item in a world where average prices were inflated."[171]

As in *Tyco*, where a similarly differentiated medical device market rendered average overcharges inadequate, Parrish's benchmarks do not meet its burden to show it is capable of demonstrating impact and injury through common proof.  This is not a price-fixing case, nor is the PICC market a commodity market with a standardized pricing scheme.  As Parrish acknowledges, a wide variety of different types of purchasers—with varying degrees of bargaining power, distinct product needs, and preferences—negotiate with Bard to purchase a wide variety of PICC products in unique configurations.  There is no standard price, no standard product, and no standard purchaser.

The average overcharge Parrish's benchmarks purport to demonstrate is inapplicable to this market because there is no reason to assume—as Parrish does—that Bard's conduct affects purchasers equally and in the same way.  For example, a benchmark showing a 30% overcharge could mean half of the class was not overcharged at all and the other half paid a 60% overcharge. This is precisely why Parrish must do more than suggest "plaintiffs purchased an item in a world where average prices were inflated."[172]  As other courts in similar circumstances have found, an average overcharge fails to demonstrate a common methodology for proving impact and injury because nothing in the methodology "attempts to show that all or nearly all purchasers were overcharged in that amount, or in any amount at all."[173]

---

[170] *Tyco*, 247 F.R.D. at 166 (emphasis in original) (internal quotation omitted).

[171] *Id.* (rejecting plaintiffs' contention that "analysis of class certification in a monopolization case like this case is no different than a price-fixing conspiracy case").

[172] *Id.*

[173] *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014).

Parrish's proposed methodology simply "assumes the very proposition that [Parrish is] now offering it, in part, to show."[174]  After dubiously transforming a highly individualized set of factors into proof PICC pricing is determined by common factors, Parrish then assumes its average overcharges can be applied uniformly across the class.  The court is not persuaded.

In sum, Parrish has failed to show it is capable of demonstrating antitrust impact and injury through common proof.  Accordingly, it has not met its burden under Rule 23(b)(3) of demonstrating common issues predominate.

## B.  The *Comcast* Problem

In addition to failing to demonstrate a capacity to prove impact and damages through common proof, Parrish's benchmarks do not meet the requirements established by the Supreme Court in *Comcast Corp. v. Behrend*.[175]  In *Comcast*, the Court held a damages model "must measure only those damages attributable to [the theory of harm].  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."[176]  There, the Court reversed the lower courts' class certification because the model used to demonstrate class-wide damages did not disaggregate between damages resulting from an accepted theory of antitrust liability and theories the district court had rejected.[177]  A class may not be certified under Rule 23(b)(3) if a model is unable "to bridge the differences between supracompetitive prices in general and supracompetitive prices attributable to the [challenged conduct]."[178]  Parrish's model is

---

[174] *Id.*

[175] 569 U.S. 27 (2013).

[176] *Id.* at 35.

[177] *Id.* at 31–32.

[178] *Id.* at 38.

inadequate under *Comcast* because, by Parrish's own admission, it does not bridge this difference.[179]

Bard argues Parrish's model fails *Comcast* for two reasons. First, Parrish's models do "not account for lawful factors that can explain the difference in margins between [its] 'benchmarks' and Bard's PICC business."[180] As Parrish's own expert testified in his deposition, the margins between Bard PICCs and the benchmark comparators could vary for a range of "non-liability" reasons and Parrish's model does not account for those factors.[181] Second, Parrish's model does not disaggregate Bard's "allegedly unlawful margins on PICCs from its lawful margins on TLS."[182] Parrish's expert calculates the overcharge suffered by proposed class members by combining Bard's margins for PICCs and TLSs, "even though Parrish claims that TLSs comprise a separate product market and does not challenge Bard's alleged marked power in TLS as unlawful."[183]

In its Reply, Parrish's response largely concedes the inadequacy of its methodology. Parrish first counters its models do control for lawful factors explaining the difference in margins between the benchmarks and Bard's PICC business. Next, it promises it will be able to better

---

[179] The court acknowledges that an individualized damages inquiry "is not, standing alone, sufficient to defeat class certification." *Menocal*, 882 F.3d at 922. Individual damages determinations "will only destroy predominance if those 'individualized issues will overwhelm . . . questions common to the class.'" *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 798 (10th Cir. 2019) (quoting *Roderick*, 725 F.3d at 1220). In Parrish's case, however, damages are not the only element requiring individual inquiry. Because, as discussed above, the element of antitrust impact is also not capable of class-wide proof, this is a case where "individualized issues will overwhelm . . . questions common to the class." *Id.* Further, because Parrish's proposed model is unable to isolate overcharges resulting from the challenged conduct, the court finds the logic of *Comcast* applies equally to the impact and damages elements of Parrish's antitrust claim. Parrish's model does not provide a method for determining either the extent of injury or damages, or whether any particular class member was injured at all, because it cannot identify what portion of the price of PICC results from Bard's alleged violation.

[180] *Opposition* at 33.

[181] *Id.* at 34.

[182] *Id.* at 35.

[183] *Id.*

disaggregate lawful from unlawful overcharges in the future.  To the first point, Parrish argues its benchmarks "isolate everything except the existence or nonexistence of tying" because all of the comparators have certain market advantages—the key distinction is the presence of the tie.[184] Concerning the second point, Parrish acknowledges the inability of its model to disaggregate between lawful TLS overcharges and unlawful overcharges related to the alleged monopoly conduct in the PICC market.[185]  However, Parrish argues it will be able to do this at trial because it will obtain more data from Bard—data Bard attests does not exist—or, as Parrish argued at the hearing on the Motion, it will figure out another solution.[186]  Regardless of whether this refinement is possible, this concession is fatal to Parrish's argument at this stage.[187]

While Parrish does not now need to prove a capacity to win at trial,[188] its burden at class certification is to demonstrate it, "*in fact*," has a methodology capable of meeting Rule 23(b)(3)'s predominance requirement.[189]  Parrish must prove its methodology meets this standard now and individual questions—such as damages and impact—will not "overwhelm questions common to the class."[190]  Parrish's promise to refine its model to meet these requirements in the future fails to meet its burden today.[191]  Were the court to accept Parrish's attempt to hand-wave away its

---

[184] *Reply* at 24.

[185] *Id.* at 25.

[186] *Id.* at 14, 25.

[187] Because the court concludes Parrish's concession about the inadequacy of its model resolves this issue for these purposes, it need not engage with Parrish's first argument.

[188] *See Occidental Petroleum Corp.*, 69 F.4th at 1185 ("The predominance inquiry at class certification asks to what extent issues susceptible to class-wide proof predominate over those requiring individual inquiries—not whether such issues are likely to be resolved in Plaintiffs' favor.").

[189] *Comcast*, 569 U.S. at 34 (emphasis in original) (noting plaintiffs' burden under Rule 23 is more than "a mere pleading standard.") (internal quotation omitted).

[190] *Id.*

[191] *In re Med. Waste Serv. Antitrust Litig.*, No. 2:03MD1546 DAK, 2006 WL 538927, at *8 (D. Utah Mar. 3, 2006) ("It is simply not enough that Plaintiffs merely promise to develop in the future some unspecified workable damage formula.  A concrete, workable formula must be described before certification is granted.").

acknowledged methodological shortcomings, it "would reduce Rule 23(b)(3)'s predominance requirement to a nullity."[192]

In sum, because Parrish's methodology does not distinguish between Bard's lawful and allegedly unlawful overcharges, its model is unable to "bridge the differences between supra-competitive prices in general and supra-competitive prices attributable" to Parrish's theory of harm.[193]  Accordingly, for this additional reason, Parrish has failed to demonstrate class certification under Rule 23(b)(3) is appropriate.[194]

For the reasons explained above, Parrish's Motion to certify a Rule 23(b)(3) damages class is DENIED.

### 3. Rule 23(b)(2)

In addition to its request to certify a Rule 23(b)(3) damages class, Parrish also seeks certification of an injunctive class under Rule 23(b)(2).[195]  In a single cursory paragraph at the end of its Motion and Reply briefs,[196] Parrish argues an injunctive class should be certified because Bard's monopolization of the PICC market has imposed class-wide price injury, suppressed competition in the PICC market, and will likely continue to do so in the future.[197]  Parrish vaguely asserts that, to the extent Bard's market power results from its alleged exclusionary conduct, "all this conduct should be enjoined."[198]  As discussed above, Parrish fails

---

[192] *Comcast*, 569 U.S. at 36.

[193] *Id*. at 38.

[194] Because the court concludes Parrish has, for multiple reasons, failed to establish predominance under Rule 23(b)(3), it does not address whether a class action is a superior method for adjudicating the controversy.

[195] *Motion* at 22–23.

[196] The court notes Parrish made no mention of its Rule 23(b)(2) request at oral argument.

[197] *Id*.; *Reply* at 25.

[198] *Id*.

to meet the threshold requirements of Rule 23(a).  Even assuming those requirements are met for these purposes, the court finds Parrish also fails to meet its burden under Rule 23(b)(2).

Rule 23(b)(2) permits certification of an injunctive class "if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[199] Plaintiffs must demonstrate "a certain cohesiveness among class members with respect to their injuries."[200]  In other words, "class members' injuries are 'sufficiently similar' that they can be remedied in a single injunction without differentiating between class members."[201]

Bard argues that, in addition to failing to meet the typicality and adequacy requirements of 23(a), Parrish's bid for certification of a Rule 23(b)(2) class fails for at least two other reasons.[202]  First, Parrish's proposed class is insufficiently cohesive because "there are likely winners and losers from the requested equitable relief."[203]  Second, certification of an injunctive class is inappropriate where "the relief sought is primarily damages."[204]  Bard asserts Parrish's complaint makes "crystal clear" the primary relief sought is retrospective money damages and the claim for injunctive relief "is a mere afterthought," noting the lack of any reference to class members' intention to buy PICCs from Bard in the future.[205]  Bard bases this argument on the Advisory Committee's Note to Rule 23(b)(2)—stating that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money

---

[199] Fed. R. Civ. P. 23(b)(2).

[200] *Shook*, 543 F.3d at 604 (citation omitted).

[201] *Devaughn*, 594 F.3d at 1200 (quoting *Shook*, 543 F.3d at 604).

[202] *Opposition* at 40.

[203] *Id.* at 41.

[204] *Id.*

[205] *Id.*

damages"[206]—and the Tenth Circuit's decision in *Monreal v. Potter*.  There, the Circuit found the district court did not abuse its discretion in denying certification of a 23(b)(2) class when, in part, "it is clear from the pleadings . . . that the primary relief sought is monetary damages."[207]

Bard's arguments are well-taken, but the court finds Parrish's request for certification under Rule 23(b)(2) fails for a more fundamental reason.  While the court does not make arguments for the parties, it does have an obligation to apply the law as articulated by the Tenth Circuit.  In this Circuit, "Rule 23(b)(2)'s bottom line" requires plaintiffs at the class certification stage to "describe in reasonably particular detail the injunctive relief they seek 'such that the district court can at least conceive of an injunction that would satisfy [Rule 65(d)'s] requirements, as well as the requirements of Rule 23(b)(2).'"[208]  Rule 65(d) "requires that injunctions be 'specific in terms' and 'describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.'"[209]

Parrish's 23(b)(2) certification request does not meet this standard.  In a single paragraph at the end of its Motion and Reply briefs, Parrish simply states "[t]o the extent Bard maintains its PICC market power by its exclusionary conduct, all this conduct should be enjoined because Bard has acted on grounds generally applicable to the proposed Class."[210]  Parrish's sweeping, conclusory request lacks any "reasonably particular detail"[211] as to the injunctive relief sought and fails to describe—without reference "to the complaint or other document"[212]—what specific

---

[206] Fed. R. Civ. P. 23(b)(2) Advisory Committee's Note.

[207] *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004).

[208] *Devaughn*, 594 F.3d at 1200 (quoting *Shook*, 543 F.3d at 605 (internal quotations omitted)).

[209] *Monreal*, 367 F.3d at 1236 (quoting Fed. R. Civ. P. 65(d)).

[210] *Motion* at 23; *Reply* at 25.

[211] *Devaughn*, 594 F.3d at 1200.

[212] Fed. R. Civ. P. 65(d)(1)(C).

acts the court is to restrain or how it is to craft an injunction.  Other courts in this Circuit have found similarly "vague, partially formulated request[s] for injunctive relief" insufficient to meet Rule 23(b)(2)'s requirements.[213]

Even assuming Rule 23(a)'s requirements are met, Parrish's request for certification of a Rule 23(b)(2) class lacks sufficient detail for the court to find "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[214]  Parrish's request to certify a Rule 23(b)(2) class is DENIED.

## CONCLUSION

For the reasons stated above, Parrish has not met its burden for certification of either a Rule 23(b)(3) damages class or a Rule 23(b)(2) injunctive class.  Accordingly, its Motion[215] is DENIED.

SO ORDERED this 27th day of December 2023.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[213] *In re EpiPen*, 2020 WL 1180550, at *59 (denying certification where plaintiffs simply requested the court enjoin defendants from engaging in the alleged antitrust violation because they failed "to describe the injunctive relief they seek with sufficient detail and, as a consequence, the court cannot determine whether classwide injunctive relief is appropriate under Rule 23(b)(2)."); *see also Smith v. LifeVantage Corp.*, 341 F.R.D. 82, 101 (D. Utah 2022) (denying certification for request asking "[d]efendants be estopped from operating a pyramid scheme" because the vague request lacked the specificity required under Rule 23(b)(2)); *In re YRC Worldwide, Inc. ERISA Litig.*, No. 09-2593-JWL, 2011 WL 1303367, at *14 (D. Kan. Apr. 6, 2011) (finding a Rule 23(b)(2) class would not be certified where plaintiffs' "conclusory" submissions failed to "identify any particular injunctive relief with sufficient specificity" or detail because plaintiffs simply requested the court enjoin further violations of ERISA and any other "appropriate equitable or injunctive relief"); *Britton v. Car Toys, Inc.*, No. 05-cv-726-WYD-PAC, 2006 WL 3487686, at *10 (D. Colo. Nov. 30, 2006) (denying Rule 23(b)(2) certification where requested relief enjoined defendants' future violations of Title VII because "generally, injunctions requiring a Defendant to obey the law are too vague to satisfy the requirements of Fed. R. Civ. P. 65.")

[214] Fed. R. Civ. P. 23(b)(2).

[215] Dkt. 141, *Motion*.

34